**Troy Murphy MORGAN,**
**et ux., Plaintiffs**

**v.**

**BRUSH WELLMAN, INC.,**
**et al., Defendants**

**No. 3:94CV369.**

United States District Court,
E.D. Tennessee,
at Knoxville.

Sept. 4, 2001.

Steve Jenson, Baron & Budd, Dallas, TX, Ann Rowland, Rowland and Rowland, Knoxville, TN, for plaintiffs.

James Johnson, Diane Pulley, Jones, Day, Reavis & Pogue, Atlanta, GA, Kyle Carpenter, Woolf, McClane, Bright, Allen & Carpenter, Knoxville, TN, for defendants.

### *MEMORANDUM OPINION*

JARVIS, District Judge.

This products liability action was originally brought against the United States and multiple manufacturers/distributors of beryllium, beryllium oxide, and beryllium-containing products by four employees or former employees of government contractors at the Y–12 and K–25 nuclear armament factories in Oak Ridge, Tennessee. Plaintiffs claim that they contracted chronic beryllium disease (CBD) from exposure to beryllium dust or fumes while working on beryllium-containing parts of nuclear weapons between 1958 and the early 1990s. It was in the early 1990s that advances in medical science allowed the discovery that plaintiffs had acquired a dangerous sensitivity to beryllium and they were removed from jobs where they came into contact with beryllium. Summary judgment was previously entered in favor of the United States and a number of other defendants have been dismissed. There currently remain four defendants who supplied either beryllium oxide, metal beryllium blanks which were machined at Y–12, or finished ceramic parts containing

beryllium for use at Y–12. All of the remaining defendants have moved for summary judgment on multiple grounds. For the reasons that follow, those motions will be granted and this action dismissed.

## I.

### Factual Background

The following factual allegations are considered in the light most favorable to the plaintiffs.

### A.

### The Plaintiffs

Plaintiff Troy Murphy Morgan began work at the K–25 Plant in 1952 for the Union Carbide Corporation. Approximately seven months later, he transferred to the Y–12 Plant as a machinist trainee. Between 1953 and 1963 he worked at various locations at Y–12 as a machinist, but not with beryllium. From 1963 until he retired in 1987, Mr. Morgan worked as a machinist with beryllium in the "Beryllium Shop" at Y–12. At the time that he was engaged in machining beryllium metal parts, Mr. Morgan had no idea who manufactured the parts. In 1985, Mr. Morgan underwent a physical examination which showed him to have breathing difficulties which would later be attributed to exposure to beryllium. Mr. Morgan was also exposed to beryllium oxide while at Y–12. In either 1992 or 1993, Mr. Morgan tested positive for beryllium sensitivity and was removed from any further exposure to beryllium.

Plaintiff Corky Dean McCarter began working for Union Carbide at the Y–12 Plant as a machine specialist. He worked in that job for six years until he was promoted to a machinist. He was laid off as a machinist in 1990, but recalled in October 1990 as a pipe fitter apprentice, and in 1992 promoted to the job of pipe fitter. While engaged in this work, Mr. McCarter would grind parts made of beryllium oxide. Mr. McCarter claims that until 1987 no one at Y–12 mentioned the dangers of beryllium to him. In 1987, Mr. McCarter was exposed to a "beryllium event" when he observed a beryllium mist coming out of a machine upon which he had been working. In 1993, Mr. McCarter tested positive for beryllium sensitivity. In 1994, Mr. McCarter was diagnosed with CBD. Mr. McCarter was removed from any possible exposure to beryllium after he tested positive for beryllium sensitivity.

Plaintiff Richard Emory Myers, Sr., began to work for Union Carbide at Y–12 in 1960 as a machine cleaner in the Beryllium Shop. Between 1963 and 1969, he worked in a shop where no beryllium was located. In 1969, he went to work in an assembly division to disassemble weapons parts, which contained beryllium. Between 1971 and 1972, Mr. Myers engaged in the assembly of nuclear weapons which contained beryllium parts. In 1993, Mr. Myers also tested positive for beryllium sensitivity, and in 1994 he retired. Mr. Myers contends that he never received any warnings concerning the dangers of beryllium until 1988.

Plaintiff Kathlene Beatty was hired by Y–12 in 1979. She began assembling products that had beryllium parts. However, she claims that she was given no safety instructions regarding sanding beryllium parts. Between 1983 and 1987, she sanded beryllium parts. Between 1987 and 1993, she washed ceramic parts containing beryllium, using glove boxes or a hood, but never a respirator. On May 27, 1993, plaintiff Beatty was restricted from further work with beryllium based upon a positive test for beryllium sensitivity. She has not worked with beryllium since.

### B.

### The Defendants

1. Defendant Brush Wellman, Inc., is the only remaining Western world supplier of beryllium oxide. Brush Wellman has mined and refined beryllium oxide at least since the 1930s. It also created beryllium metals at its manufacturing plant in Lorain, Ohio, until that plant burned in 1948. Since the 1930s, when workers in fluorescent light bulb factories became seriously ill, it has been suspected that airborne beryllium particles are extremely toxic to some humans. As early as 1943, workers in Brush Wellman's Lorain plant were dying and showing signs of CBD. About the same time, the United States War Department began purchasing beryllium oxide and beryllium metals from Brush Wellman and its competitor, The Beryllium Company, in large quantities.

After the Lorain, Ohio, plant burned in 1948, the Atomic Energy Commission (AEC) recognized the defense industry's need for a continuing source of beryllium products. It therefore built a new plant in Luckey, Ohio, which Brush Wellman operated. Brush Wellman operated that plant for the AEC until 1959, when Brush Wellman purchased the plant from the government. Brush Wellman continues today to manufacture beryllium oxide and beryllium metals, primarily for use by the Department of Energy (DOE) at its plants similar to the Y–12 and K–25 facilities. At times in the past, Brush Wellman produced beryllium metal "blanks" which were later machined into parts for nuclear weapons by workers at the Y–12 and K–25 Plants.

2. Defendant Cabot Corporation is a Pennsylvania corporation that is the successor to Cabot Berylco, Inc., Kawecki Berylco Industries, Inc., The Beryllium Company, Kawecki Chemical Company, and Berylco, Inc. Its liability in this case is premised on the proposition that it is a successor in interest of The Beryllium Company, which at one time manufactured beryllium oxide and beryllium products in competition with Brush Wellman. At one time, Brush Wellman and The Beryllium Company together lobbied the Occupational Safety and Health Administration (OSHA) and other government agencies against more stringent agency standards for monitoring beryllium exposure.

3. NGK Metal Corporation is another Pennsylvania corporation that is also a successor of Cabot Corporation and ultimately The Beryllium Company. Its alleged liability is similar to that of Cabot.

4. Ceradyne, Inc., is a California corporation that primarily in the 1970s and 1980s manufactured ceramic parts containing beryllium for the Y–12 Plant to use in the construction of nuclear weapons. Ceradyne was approached by the Department of Energy in 1973 to produce beryllium oxide ceramic spheres. Ceradyne was instructed precisely by DOE and Y–12 how the parts were to be made, cleaned, packaged, and labeled. The parts were manufactured based entirely upon government specifications. On at least one occasion, some of the parts, at the government's request, were remachined. This re-machining was accomplished at Ceradyne's California plant, and there is no evidence in the record to support plaintiffs' claim that the re-machining was done at the Y–12 Plant. Ceradyne last produced parts for DOE in 1987.

### C.

### Beryllium, Its Distinctive Properties and History

Beryllium possesses a unique combination of physical and mechanical properties which render it unlike any other material. It is the only light metal with a high

melting point. It has a high strength-to-weight ratio, possesses extreme hardness, is ductile, and is resistant to corrosion. Beryllium has a high permeability to x-rays due to its low atomic weight.

In nuclear reactors and nuclear weapons, beryllium is used as a reflector to confine fission neutrons and as a moderator to reduce their speeds. It has been used in nuclear weapon initiators because beryllium generates neutrons to help start a chain reaction in a supercritical mass of fissionable material, such as plutonium.

Because of the above properties, beryllium is essential to a number of applications related to DOE and DOD programs. Specifically, it has been and remains an essential component of a nuclear weapon and a source of beryllium is considered essential to the defense of the United States. Plaintiffs have suggested that boron could be a substitute for beryllium, but there is no evidence in the record to support that suggestion or that the United States Department of Defense has ever considered boron as a suitable substitute for beryllium.

It has been undisputed since the early 1950s that beryllium is extremely toxic to humans, particularly those with a sensitivity towards it. More than one scientist has described beryllium as, per molecule, "the most deadly substance known to mankind." However, with respect to the construction of the atomic bomb, its use was, and remains today, essential.

## D.

### Berylliosis

During the early commercial applications of beryllium, it became apparent that a lung disease, berylliosis, was associated with exposure to beryllium. The disease reached its apex in the fluorescent and neon lamp tube industry in the late 1940s.

At that time, the disease received widespread public notoriety.

There are two forms of the disease which manifest themselves in completely different ways. Acute berylliosis generally results from a single or several exposures to large amounts of beryllium. Its onset is quick after the exposure(s), perhaps days or weeks, and its effects include contact dermatitis, beryllium ulcers, ocular effects, and respiratory effects ranging from mild inflammation of nasal mucous membranes and pharynx to tracheobronchial involvement and pneumonitis. Virtually anyone exposed to large amounts of beryllium can contract acute berylliosis.

Chronic beryllium disease (CBD), which is the only form of berylliosis at issue in this case, has a number of features which distinguish it from the acute variety. First, it has an extremely long latency period, ranging up to 40 years. Second, it only manifests itself in a relatively small percentage of the population. Estimates of the percentage of the population who will develop a "sensitivity" to beryllium range to 1% to 16%. This sensitivity to beryllium can only arise by contact with beryllium, and there exists no test prior to exposure which will identify which workers will develop the sensitivity.

Third, medical science is yet to determine the lower limit below which no one in the population will develop beryllium sensitivity. Whatever that lower limit is, it is extremely low. This has been evident since the late 1940s when between 10 and 20 cases of CBD arose in the neighborhood of Brush Wellman's Lorain, Ohio, plant, and some of the cases had no discoverable occupational connection to the plant. Studies done in the early 1950s indicate that these non-occupational "neighborhood" cases must have resulted from incredibly small airborne exposures to beryllium dust or fumes coming from the plant.

Fourth, once an individual is sensitized to beryllium, further exposures have a cumulative effect on his or her condition and all contact with beryllium must be removed. It was not until the late 1980s that a blood test was developed that would identify which workers had developed this sensitivity. Between 1984 and 1999, 13,-770 current or former workers (69% of the estimated 20,000 workers who may have been exposed to beryllium) were screened for definite or possible CBD. Through this testing, 149 workers have been diagnosed with CBD. Of the 149, 89 have been diagnosed with definite CBD and the other 60 have clinical findings presumed to be CBD. An additional 299 workers were identified as having sensitivity to beryllium, but 219 of those did not have CBD. Finally, there appears to be little or no relation between the severity of the disease and the amount of exposure, either in quantity of beryllium or duration. Relatively minute exposures have resulted in severe disease and even death, while larger exposures have had little or no effect. This is contrary to the experience of medical science with regard to other toxic metals such as lead or mercury.

The chronic form of berylliosis generally results from inhalation of beryllium particulates and is characterized by cough, chest pain, and general weakness, symptomatic of pneumonitis. CBD has often been difficult to diagnose because of the similarity of its symptoms to other diseases, particularly respiratory.

Another problem with understanding CBD over the years has been the difficulty in accurately monitoring actual exposures to airborne beryllium and the different methods of monitoring used by different users of beryllium. This is particularly true of exposures of workers in the 1940s when virtually no monitoring was done. Understanding the relationship between the amount of beryllium exposure and CBD is particularly complicated because of the possible 40–year latency period.

OSHA reported as late as last year some of the still misunderstood questions regarding CBD:

Chronic Beryllium Disease is caused by an allergic-like reaction to beryllium. Even brief exposure to very low levels can lead to this disease, which often has a slow onset and involves changes to lung tissue that reduce lung function. The first evidence of what was to be called Chronic Beryllium Disease was identified in 1946. More recent studies indicate that reaction to beryllium depends on the type of beryllium and the work task. According to the National Jewish Medical and Research Center, the disease occurs in one to sixteen percent of exposed people, with the level of exposure that poses risk and the precise mechanisms of the disease not yet well characterized.

E.

*The Creation and Maintenance of the 2.0 Standard for 50 Years*

Use of beryllium by the United States War Department began during the Second World War under the Manhattan Project. By 1949, the newly created Atomic Energy Commission (AEC) became aware of the "neighborhood" cases of berylliosis at Brush Wellman's Lorain Plant and dispatched one of its scientists, Merril Eisenbud, to the Lorain plant to gather data and research appropriate exposure limits for workers who handle beryllium. For a number of reasons, setting these standards was inexact and speculative. No epidemiological studies were available to connect incidents of CBD with exposure levels. There were few records from the Lorain plant to establish what the exposure levels

of various employees had been and when an employee might have been exposed to a large dose of beryllium accidentally, or otherwise. Mr. Eisenbud was aware of the "neighborhood" cases and collected air samples in the neighborhood and calculated, based on plant records, the quantity of beryllium in the air surrounding the plant in the years that they neighborhood cases arose. His calculations revealed that some of the neighborhood cases appeared to have occurred in spite of only incredibly small doses of beryllium in the air. Because adequate data for establishment of an exposure limit for chronic berylliosis was not available, Eisenbud relied on data relating to the effects of other toxic materials, such as lead, on animals and humans. However, it appears that Eisenbud recognized the extreme toxicity of beryllium dust and recommended exposure standards at a fraction of the exposure standards set for other toxic metals.

The standard which Eisenbud recommended for the workplace, which was adopted by the AEC, was two micrograms per cubic meter of air. Ten years later, the American Conference of Governmental Industrial Hygienists adopted the same standard and included a modification to permit two micrograms per cubic meter averaged over an eight-hour work period. To control acute beryllium disease, the maximum permissible exposure limit was set at 25 micrograms per cubic meter. Perhaps recognizing the significance of the neighborhood cases, Eisenbud recommended a standard of 0.01 micrograms per cubic meter for out-of-plant air quality.

Eisenbud's two microgram occupational standard was adopted by the AEC on a temporary basis. It was re-adopted each year for several years and then permanently adopted. OSHA adopted the two microgram standard. Although the AEC was not compelled to comply with OSHA standards, AEC did recognize the standard at the Y–12 and K–25 Plants. The 2.0 standard remains today the occupational standard used by OSHA for beryllium exposure, in spite of the fact that it now appears that, in at least a few sensitive individuals, CBD may arise even at levels below 2.0 micrograms. In the years following adoption of the two microgram standard, the incidents of CBD diminished significantly, but did not disappear.

In a published 1951 report entitled "Epidemiology of Beryllium Intoxication," Dr. Eisenbud, who was then the Director of the Health and Safety Division of the AEC, wrote that, "[t]here was general agreement among investigators that there was no apparent relationship between the incidents of chronic disease and the severity of exposure to beryllium and that cases occurred under conditions of varied minimal exposure." Dr. Eisenbud further noted the arbitrary nature of the two microgram standard:

> The plants and laboratories of the United States Energy Commission are currently using the 2y of beryllium per cubic meter of air as the maximum permissible daily average exposure. This is a tentative and *admittedly arbitrary* operating criterion, *the validity of which cannot be supported by existing data.* It has been recommended by the Commission to its contractors as being the most reasonable tentative level in the judgment of a number of investigators who are familiar with the disease.

> The rest of such a low value as 2y/ cu.m. may be very difficult. Obviously, individuals who were exposed to initially higher levels must be excluded in the evaluation. It must be assumed that the effective burden of beryllium in the lung is related to the concentration and time, and with such low levels of exposure and immunologically significant pulmonary

deposit may take place only after a number of years. In addition, there may be considerable delay between the exposure and the onset of the disease, to further prolong the period of identifying the significant end point.

With high levels of exposure, only a relatively small percentage of the population developed berylliosis, but there were severe and even fatal cases in each of these groups. It is conceivable that with lower exposures a set of conditions would finally obtain in which there were no fatal or even serious disability cases, but the most hyperergic individuals would respond by a mild-to-moderate pulmonary inflammation. With the lack of accurate diagnostic criteria, such a circumstance superimposed on the above factors would make the evaluation of a maximum allowable concentration an extremely difficult matter.

(emphasis supplied). Thus, it is clear that as of 1951, the AEC was aware that there was no known safe level of beryllium exposure which would protect all workers and that, at least with respect to the neighborhood cases, CBD had been found in a small group of people who had been exposed to beryllium at levels far below the 2.0 standard.

The 2.0 standard remained in effect for many years and was not seriously at issue until the mid–1970s, when OSHA considered the possibility of cutting the standard in half based on studies showing that beryllium could cause cancer in laboratory animals. Brush Wellman and The Beryllium Company lobbied against this reduction, making arguments that tests were inconclusive as to whether beryllium was a carcinogen in humans, that distributors of beryllium could be forced out of business if the standard was lowered due to increased production costs, and that there were no occupational cases of CBD at "documented" levels under the 2.0 standard.

Plaintiffs contend that this latter statement was false and that there existed "documented" cases of occupational CBD at exposures under the 2.0 standard. However, because of the problems mentioned by Eisenbud, such as the lengthy latency period, the inability to accurately measure the exposure level of an individual worker, and different measurement techniques, it cannot be said that this statement by the beryllium producers was patently false. The neighborhood cases suggest that it is probable that CBD has occurred at exposure levels under the 2.0 standard, that even those cases cannot be "documented" because Eisenbud did not measure the exposure levels to which these victims were actually exposed, but rather extrapolated the levels several years later based on plant records. Even today, no complete record of any single individual worker's exposure to beryllium is available which would demonstrate without question that that worker developed CBD without ever being exposed to beryllium over the 2.0 standard.

Ultimately, OSHA decided not to reduce the 2.0 standard. The Department of Labor (DOL) noted in a 1977 report the following:

Lowering the TWA to 2.5–ug/m3 may result in a further reduction in the increase in beryllium disease, but the benefits simply cannot be precisely determined. However, the general provisions and, therefore, the anticipated improvements are similar to those of the proposed standard.

In summary, an in-depth treatment of the incremental benefits of reducing beryllium exposures on a TWA basis from 2–ug/m3 to 1–ug/m3 or 0.5–ug/m3 cannot be provided because of the lack of a clear dose/response relationship, the

lack of accurate exposure data, and the lack of an accepted methodology with which to evaluate the expected benefits. A DOE Special Task Group Report on Beryllium issued in 1978 noted that there appeared to be "no acceptable evidence that beryllium is a carcinogen in humans." The 1978 Task Group also noted that, "[e]vidence seems to be lacking that the present OSHA standard is marginally safe," but that "if the two micrograms per cubic meter is not safe, a 50% reduction in that level will not be appreciable safer." The Task Group ultimately recommended that in the light of the apparent absence of good reliable scientific evidence, that the Department of Labor re-evaluate the proposed change. The Department of Labor ultimately decided to stay with the 2.0 standard and that standard remains the OSHA standard in effect even today.

### F.

#### *The Safety Operations at the Y–12 and K–25 Plants*

The DOE owns a number of facilities throughout the United States, including the Y–12 and K–25 Plants where work related to atomic energy, including the construction of nuclear weapons, has been carried out since the Manhattan Project. DOE, as the owner of these facilities, is the successor of the Energy Research and Development Administration (ERDA) and the Atomic Energy Commission (AEC), and like its predecessors, DOE uses management and operating (M & O) contractors to operate these facilities. The initial M&O contractor hired to operate the K–25 and Y–12 Plants was Union Carbide and Carbon Corporation, which later became the Union Carbide Corporation. In 1984, Martin–Marietta Energy Systems replaced Union Carbide as the M&O contractor. The current contractor at those facilities is Lockheed Martin Energy Systems, the successor to Martin–Marietta as a result of the merger of Lockheed Aircraft and Martin Marietta.

DOE imposes on its M&O contractors requirements for public and employee safety and health at its nuclear facilities. 42 U.S.C. §§ 2051(d), 2061(b)(2)(B) and (C), 2201(1)(3) and 7274(m). The AEC, ERDA and DOE have all exercised the statutory authority to regulate employee safety and health at their contractor-operator facilities by a directives systems composed of orders and contractual requirements issued by DOE. Contractors at the various sites have been responsible for day-to-day operations and safety decisions under the general oversight of DOE officials. At both the Y–12 and K–25 locations, there are several hundred DOE employees who are engaged in a supervisory role with respect to several thousand Martin–Marietta employees who perform the day-to-day operations of the plants. These workers are clearly employed by Martin–Marietta and not the United States.

Over the past 50 years, beryllium arrived at the Y–12 and K–25 Plants in several different forms. From Brush Wellman and The Beryllium Company, beryllium was shipped in a powder form of beryllium oxide. Specifications for the beryllium oxide, the containers it was shipped in, and the warnings attached by the vendors were all specifically prescribed by the United States. In the early 1950s, the AEC actually supplied the warning labels to be placed on the packaging. In later years, the AEC and its successors dictated the contents of the warning labels. The beryllium oxide arrived at the plant, double-bagged, as required by government specifications. Once at the plant, material handlers would remove the beryllium oxide from its vendor's packaging and place it in Y–12's own packaging with the govern-

ment's own warning. It would then often be stockpiled for later use.

When needed, normally the beryllium oxide would be hot-pressed by Y–12 workers into metal blanks. Later, Y–12 workers would machine those blanks into finished parts for assembly into nuclear weapons. On some occasions over the years, Brush Wellman actually provided beryllium metal blanks for Y–12. These blanks were cleaned, packaged, labeled and shipped to Y–12 under the government's strict specifications. These blanks would then, when needed, be machined into finished parts by Y–12 workers.

Finally, the government ordered some finished parts, particularly in the late 1970s and early 1980s, from vendors such as Ceradyne. These vendors were required to comply with strict governmental specifications regarding the manufacture of the finished parts and their cleaning, packaging, labeling and shipping to Y–12.

The government was aware of the serious dangers of airborne particulate beryllium and implemented elaborate safety precautions for the handling of beryllium oxide, the blanks, or finished parts. The precautions used included the use of gloves and changing clothing after being in the areas of potential beryllium exposure, vacuuming and wet-washing of surfaces, use of respirators when working with beryllium oxide, and allowing the machining of beryllium parts to be done only under negative pressure vented hoods where exposure to particulate beryllium could be minimized. England, at its Cardiff Plant, apparently used enclosed glove boxes for the machining of at least some of its beryllium. England and the United States have been sharing information regarding the dangers of beryllium since 1958. However, although DOE used closed glove boxes for work with radioactive elements such as plutonium, it seldom

used the glove boxes for workers machining beryllium parts. Apparently it was felt by DOE that the use of negative pressure vented hoods was a sufficient protection.

Affidavits of scientists who worked at Y–12 during the 1970s establish that although DOE was aware of the 2.0 standard, it also had a policy known as ALARA, or "As Low As Reasonably Attainable", as the amount of beryllium to which a worker should be exposed. The policy was set out in writing for workers at the Y–12 "Beryllium Shop" as follows:

*Policy:* It is the policy of this plant to provide every safety measure possible on jobs involving potential hazards to employees. In this procedure, particular emphasis is placed on the hazards involving the handling and machining of beryllium.

It was recognized by DOE that the 2.0 standard was not an absolutely safe exposure level for all workers. Accordingly, DOE maintained "action levels" below the 2.0 standard which triggered corrective measures. For example, when an air sample reached the 1.0 microgram per cubic meter of beryllium, DOE and the contractor would take steps to locate the source of airborne beryllium. It is important to note that the 2.0 standard identifies a microscopic level of beryllium. A British scientist who worked at the Cardiff facility in the 1970s described the amount of beryllium necessary to trigger the 2.0 standard and the efforts Y–12 took to stay under that standard as follows:

The two microgram per cubic meter of air beryllium standard is an extremely low level of material. In fact, it is an amount of material that cannot be seen by the naked eye. Two micrograms per cubic meter of air is the equivalent of taking the tip of a pencil and spreading it over a football field six feet high. As

such, these are extremely minute particles and for the plaintiffs to claim to have seen a visible cloud of beryllium dust would mean that they were exposed to greater than two micrograms per cubic meter of air of beryllium. In fact, for there to be a visible cloud of beryllium dust would mean an exposure of beryllium in the milligrams per cubic meter of air.

Beryllium is a material that must be used for nuclear weapons. There is no current substitute for beryllium's application in the nuclear weapons industry. As such, an industrial hygienist must use engineering controls that maintain exposure to an ALARA level. Measures used at Y–12, including wet-machining of all beryllium oxide parts, the use of negative pressure hoods for machining applications, and wet-mopping of all areas where beryllium was in use. These are standard industrial hygiene measures for the control of respirable substances. Through use of these measures, Y–12 was making the best effort to control beryllium exposure from an industrial hygiene standpoint. Further, the Y–12 facility was a highly knowledgeable entity with knowledge of all beryllium dangers and hazards. The Y–12 facility employed state of the art technology to maintain its beryllium control to an ALARA principle.

Affidavit of Graham Cogbill. There is no evidence presented in the record which disputes Dr. Cogbill's assertions that these safety precautions were in effect at Y–12 during the 1970s.

## II.

### The Sixth Amended Complaint and Allegations of Civil Conspiracy

With respect to the remaining defendants, the plaintiffs' Sixth Amended Complaint, which is the operative complaint at this time, alleges that the defendants' beryllium products were unreasonably dangerous in design, manufacture, and marketing within the meaning of the Tennessee Products Liability Act and Section 402A, Restatement of Torts. Plaintiffs contend that defendants placed the defective products in the market which proximately caused plaintiffs' injuries. Plaintiffs contend that the manufacture and processing of beryllium was an ultra-hazardous activity for which they are strictly liable.

Plaintiffs contend that the defendants impliedly warranted that their beryllium products were of good and merchantable quality and fit and suitable for the particular purpose for which they were intended. Plaintiffs contend that the defendants breached these warranties, proximately injuring them.

Plaintiffs further contend that the defendants failed to meet a duty to warn plaintiffs of the hazardous characteristics of their beryllium products and adequately test, research and develop safe substitutes for beryllium and to recall unsafe products from the marketplace.

Plaintiffs further complain that Brush Wellman actually knew or should have known that an airborne concentration of beryllium below the two microgram standard was not safe and would cause chronic beryllium disease. Plaintiff complains that as early as March 1951, Brush Wellman and the AEC, the ERDA, and the DOE conspired to conceal the true hazards and risks of airborne beryllium dust. Plaintiffs contend that in furtherance of the conspiracy, Brush Wellman and the AEC agreed to tell workers that as long the two microgram standard was met, workers would be safe from CBD. Plaintiffs contend that Brush Wellman and the AEC's public statements were false with regard to the safety of the two microgram standard.

Plaintiffs further contend that as a result of this conspiracy between Brush Wellman and the AEC and its successors, the plaintiffs were proximately injured.

Plaintiffs also contend that beginning as early as 1951, Brush Wellman conspired with The Beryllium Company to conceal the true hazards and risks of airborne beryllium dust, and that susceptible workers would develop CBD at below the two microgram standard. Rather, plaintiffs allege that Brush Wellman and The Beryllium Company and its successors agreed to tell their customers and the customers' employees, including the plaintiffs, that workers were safe from CBD as long as the two microgram standard was met. Plaintiffs claim that these defendants made false statements by publicly stating that the two microgram standard was safe. Further, plaintiffs contend that as a proximate result of the alleged conspiracy between Brush Wellman and The Beryllium Company and its successors, plaintiffs were injured by contracting CBD and suffering increased risks of cancer, respiratory, dermatological, and cardiovascular disease.

Thus, plaintiffs' conspiracy theory is grounded on two alleged long-standing conspiracies to conceal the true hazards of beryllium. The first conspiracy was between Brush Wellman and agencies of the United States. The second conspiracy was between Brush Wellman and other beryllium vendors. The United States was both a participant in the first conspiracy and a victim of the second conspiracy.

## III.

### Summary Judgment Standards

Pursuant to Rule 56, summary judgment shall be rendered when requested if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. It is the burden of the party seeking summary judgment to show the court that, under uncontradicted facts, the moving party is entitled to judgment as a matter of law. Summary judgment is intended to provide a quick, inexpensive means of resolving issues as to which there is no dispute regarding the material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In assessing the validity of a summary judgment motion, the court views the pleadings, depositions, answers to interrogatories, admissions, and competent affidavits in a light most favorable to the opponent of the motion. However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which the party will bear the burden of proof at trial. *Catrett*, 477 U.S. at 322, 106 S.Ct. 2548.

## IV.

### Analysis

#### A.

#### The Government Contractors Defense

■ The defendants contend that each of the plaintiffs' claims are barred by

the government contractors defense. The court agrees. The leading case with respect to the government contractors defense is *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), where the United States Supreme Court articulated a three-part test applicable to a plaintiff's design defect claim. A design defect claim is barred if with respect to the product supplied to the government: (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the manufacturer warned the United States about the dangers in the use of the equipment known to the manufacturer, but not the United States. *Boyle* 487 U.S. at 512, 108 S.Ct. 2510.

The defendants have met each of the three parts of the *Boyle* test. First, the AEC gave the defendants precise, secret specifications for beryllium supplied to the Y–12 and K–25 Plants. Not only were the products themselves exactly specified, but so was the cleaning, packaging and labeling of those products. Not only were the products reasonably specified by the government, they were precisely and exactly specified. The affidavits of defendants' employees establish that the specifications, particularly warning labels, were exactly complied with and there is no evidence in the record that any deviation from the government standards was ever permitted or occurred.

■ In addition, the government was aware of all of the dangers of beryllium known to the defendants and more. The AEC's Dr. Eisenbud was responsible for the setting of the 2.0 microgram standard in 1951. Dr. Eisenbud, as well as the AEC, were aware of cases of CBD at under the 2.0 standard through the neighborhood cases. In fact, one of plaintiffs' experts, Dr. Egilman, filed a report which was submitted in this case alleging that both Brush Wellman and the AEC knew or should have known that the 2.0 standard did not protect all workers against CBD; that Brush Wellman and the AEC calculated the risk of CBD versus the cost of lowering the standard; that Brush Wellman and the AEC controlled the scientific and medical literature; and that Brush Wellman and AEC controlled the data with regard to beryllium and CBD. As early as 1951, Dr. Eisenbud hypothesized in published articles that the 2.0 exposure standard would induce mild-to-moderate pulmonary inflammation in hypersensitive workers. In 1953, the AEC would characterize the 2.0 standard as an "acceptable risk", even though a small portion of the work force was likely to develop CBD. That same year, The National Academy of Sciences Materials Advisory Board issued a report finding "no reasonable doubt remains that beryllium, its oxides, and its salts are dangerously poisonous" and expressed doubt that the 2.0 standard would ensure complete protection. The United States also had knowledge gained from owning the Lorain plant throughout most of the 1950s and knowledge gained by hundreds of scientists employed by various government agencies. Long before any of the plaintiffs in this case were exposed to beryllium, the United States was well aware that the 2.0 standard would not protect that portion of the work population that was hypersensitive to beryllium. The contractor is not required to warn the United States of those things it already knows. *Boyle,* 487 U.S. at 513, 108 S.Ct. 2510.

The court concludes that no question of material fact remains with respect to the applicability of the government contractors defense to plaintiffs' claims, and that all of the remaining defendants are entitled to summary judgment on those claims. With

respect to duty to warn claims, which form the basis of all of plaintiffs' claims in this case, *Boyle* is clearly applicable. *See Tate v. Boeing Helicopters,* 55 F.3d 1150, 1157 (6th Cir.1995) (Tate I); *Kerstetter v. Pacific Scientific Company,* 210 F.3d 431, 438 (5th Cir.2000) (applying *Boyle* to failure to warn cases).

The government's purchase and use of beryllium products reflects its policy decisions to balance worker safety and the combat readiness of the United States. Placing liability on the government suppliers for failing to warn the government of dangers of which it was already aware would interfere with the government's ability to make those policy judgments.

### B.

*The Sophisticated Manufacturer Defense*

 Defendants also claim that the plaintiffs' claims are barred by the sophisticated manufacturer defense. Under Tennessee law, a supplier may reasonably rely on a sophisticated purchaser to warn users about the dangers of its products. A manufacturer is relieved of its duty to warn when goods are sold to such a sophisticated user. This defense applies whether the cause of action is based on strict liability, breach of warranty, or negligence. *Whitehead v. Dycho Company,* 775 S.W.2d 593, 599–600 (Tenn.1989).

The court concludes that based upon the undisputed record, the United States agencies and its contractors at Y–12 and K–25 have been and are sophisticated users of beryllium. The United States used beryllium in the creation of the first atomic bomb. The Department of Energy performed the early studies on beryllium toxicity and set the standards for occupational and out-of-plant exposures. The United States agencies involved executed comprehensive safety programs for worker protection from beryllium dangers in conjunction with its contractors at Y–12 and K–25. The court is in agreement with the defendants that the United States is arguably the world's most sophisticated user of special nuclear materials, including beryllium. Whether the United States is a sophisticated user of beryllium does not raise a question of material fact. In fact, the United States was such a sophisticated user that it created the standard for worker exposure and dictated the warnings which its suppliers such as the defendants would attach to their products. Under the circumstances, all of the plaintiffs' theories of recovery which are related to the alleged failure to warn the plaintiffs, including all strict liability, warranty and negligence claims, are barred by the sophisticated user defense.

### C.

*The Plaintiffs' Causation Problem*

 One of the fundamental concepts of tort liability is that liability on the part of the defendant is premised upon a duty on the part of the defendant owed to the plaintiff, a breach of the duty, and resulting damages. Absent such a duty, there can be no liability. In this case, all of the plaintiffs' theories of recovery are premised on a theory that defendants had a duty to warn the plaintiffs that the 2.0 microgram standard was inadequate to protect all workers from CBD. However, the defendants, under the unique circumstances of the K–25 and Y–12 plants, where the work was all done in secret, could not have identified the plaintiffs, were completely unaware of the safety precautions being taken at the plants, and would not have been permitted to contact the plaintiffs in any event. Because the government and its contractors were the only parties in a position to warn the plaintiffs and protect them from the dangers of beryllium, the defendants had no duty to warn the plaintiffs.

■ Judge Edgar of this district has previously addressed a similar question in *Byrd v. Brush Wellman*, 753 F.Supp. 1403 (E.D.Tenn.1990). In *Byrd*, the plaintiffs claimed that they had contracted CBD from beryllium supplied by Brush Wellman to their employer, General Electric. Like the United States and its contractors, GE had knowledge of the risks of beryllium and its dangers. Judge Edgar rejected plaintiff's claims holding "since [the employer] was obviously knowledgeable about the dangers associated with beryllium-containing products and was the only party in a position to effectively warn the plaintiff and guard against those dangers, Brush Wellman had no duty to warn the plaintiff." *Id.* at 1413. This case is even more compelling than *Byrd* because here the defendants had no access to employees at a secured nuclear weapons plant. In this case, all of the plaintiffs' tort theories are barred simply because the defendants had no duty to the plaintiffs. That duty was assumed by the United States and its contractors.[1]

■ Moreover, it cannot be said that any failure to warn or misrepresentation by the defendants proximately caused the plaintiffs' injuries. The AEC and its successors assumed the safety responsibility for the workers in its plants. The acts or omissions of these government agencies would constitute an intervening cause that would immunize the manufacturers/vendors from liability.

### D.

*Plaintiffs' Civil Conspiracy Theory*

■ Plaintiffs' final theory of recovery against the manufacturer/distributor defendants is the most complex and was not articulated until the plaintiffs submitted their Sixth Amended Complaint. In its latest form, the civil conspiracy as two parts. In the first part, Brush Wellman allegedly conspires with the United States government, through the Atomic Energy Commission, to withhold important safety information about the dangers of beryllium from the public. This part of the alleged conspiracy would have occurred during the 1950s when the AEC was establishing the appropriate levels for beryllium exposure. In the second part, Brush Wellman allegedly conspired with The Beryllium Company, and other manufacturers, to withhold from the government actual knowledge of the dangers of beryllium exposure. This part occurred later, mainly during the 1970s, when OSHA was considering tightening the 2.0 standard. The alleged factual basis of the plaintiffs' conspiracy claims are set out in a report of their expert, Dr. Egilman. Dr. Egilman's report claims that Brush Wellman engaged in a 50–year campaign of conspiracy "to mislead the public, public health officials, medical researchers, workers and customers about the nature and hazard in the use of beryllium compounds they sold." Dr. Egilman claims that Brush Wellman engaged in the following tactics:

1. Deploying tautological arguments that CBD could not occur below two;

2. With the AEC, exercising control of much of the scientific and medical literature on beryllium disease;

3. Engaging in public relations campaigns designed to minimize the perception of beryllium's toxicity;

1. The United States Congress has recently enacted a compensation plan entitling plaintiffs and other injured beryllium workers to receive a $150,000 lump-sum payment and medical benefits. Passage of this legislation is an implicit acceptance of responsibility by the United States for the injuries caused by beryllium to workers in nuclear plants owned by the United States.

4. Dissemination of misrepresentations of its knowledge on the following topics:

(a) Evidence of CBD cases in workers exposed below the 2 standard;

(b) The Lorain neighborhood studies;

(c) What it knew and when (state of the art);

(d) Health and safety information to customers;

(e) Sampling and monitoring methodology;

5. Action to influence the Department of Energy to maintain OSHA exposure standard at 2ug/M3;

6. Joint Brush Wellman and Berylco campaign to:

(a) Create cautionary labels;

(b) Lobby governmental and international regulatory agencies;

(c) Seed the medical literature with false statements supporting their position.

Dr. Egilman alleges that as part of the conspiracy Brush Wellman failed to report some cases of CBD at its plants to the National Beryllium Registry; threatened agencies of the United States, such as OSHA and the DOE, that it would be forced out of business and therefore dry up the nation's beryllium supply if forced to comply with an occupational standard below the 2.0 level; and created a false and misleading "Green Book", which purported to be an independent medical book, but which was in fact industry propaganda touting the safety of beryllium products. Plaintiffs also contend that Brush Wellman and other defendants hid information they learned from an officer of an NGK metals plant in Japan that Japanese workers had contracted CBD at exposures under the 2.0 standard.

Boiled down to its essence, plaintiffs' conspiracy theory is that Brush Wellman and other defendants participated in a 50–year conspiracy to keep the actual dangers of beryllium exposure secret. In the early years, the United States, through the Atomic Energy Commission, was a conspirator. In later years, the United States, through the Department of Energy and OSHA, was a victim of the conspiracy. Allegedly because of the effectiveness of this conspiracy, DOE and its contractors failed to reduce the 2.0 standard and take further precautions to limit exposures to beryllium. Conceivably, one such measure could have been to require the use of glove boxes with respect to all handling of beryllium materials. As a result, allegedly, such steps were never taken and the plaintiffs were exposed to beryllium in amounts sufficient to trigger their beryllium sensitivity. Plaintiffs argue, as they must to keep their claims alive, that in the absence of the 50–year conspiracy, they would not have contracted CBD. For multiple reasons, plaintiffs' conspiracy claims do not state a claim upon which relief can be granted.

■ The elements of a cause of action for civil conspiracy under Tennessee law are as follows: (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) resulting injury. *Menuskin v. Williams,* 145 F.3d 755, 770 (6th Cir.1998). Plaintiffs have not presented proof which would establish any of the four elements in this case.

First, there is no evidence of a "common design" between the AEC and Brush Wellman to hide information about the safety of beryllium from the plaintiffs or the public., Dr. Eisenbud published his study on berylliosis in 1951, publicly pointing out that the 2.0 standard was not based on epidemiological studies and was in fact an

arbitrary and unproven standard. While Brush Wellman and The Beryllium Company did lobby OSHA against lowering the 2.0 standard, there is no evidence that they did anything other than attempt to keep OSHA from imposing on beryllium manufacturers stricter guidelines which would increase their production costs. OSHA's guidelines were not mandatory with respect to DOE facilities, and there is no evidence in the record even suggesting that Brush Wellman and/or The Beryllium Company or its successors ever suggested to DOE or its predecessors what the standards should be at the government's nuclear plants.

Second, there is no evidence of record of an "unlawful" purpose, or a "lawful purpose by unlawful means." At most, plaintiffs allege that defendants made false statements about the safety record of beryllium, which does not constitute either an unlawful purpose or an unlawful means.

Third, there is no evidence of an overt act in furtherance of the conspiracy. At most, plaintiffs allege that the defendants failed to disclose information they were aware of, such as the "neighborhood cases," cases of berylliosis in their own factories, or the Japanese cases.

Fourth, there was no "resulting injury" to the plaintiffs, which term implies a proximate cause element. There is no evidence that anything Brush Wellman or the other defendants might have publicly divulged would have caused DOE or its predecessors or OSHA to change the 2.0 standard or change the safety precautions used at the Y–12 or K–25 plants to further protect the plaintiffs and other workers from beryllium exposure. The evidence is undisputed that in spite of everything that is known today, OSHA still maintains the 2.0 standard, in spite of doubt that it would protect all workers from berylliosis. DOE and its predecessors have never relied fully on the 2.0 standard in any event, instead following an "action" standard of 1.0 and throughout the 1970s an "ALARA" standard. Even if the defendants had publicly divulged everything they might have known regarding the dangers of beryllium and the AEC and OSHA had lowered the 2.0 standard, there is still no evidence that a lower standard would have prevented any plaintiff from contracting CBD. Plaintiffs, quite simply, cannot establish the requisite proximate cause, and this failure on the causation element is also fatal to all of the plaintiffs' other claims.

■■■■■■ In addition, under Tennessee law civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy. *Tennessee Publishing Company v. Fitzhugh*, 165 Tenn. 1, 52 S.W.2d 157, 158 (1932). If the underlying tort is not actionable, a plaintiff's claim for civil conspiracy fails. *Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn.1994). Plaintiffs' tort theory underlying their civil conspiracy claim in this case is fraud or misrepresentation. For several reasons, plaintiffs fail to state a state law claim of fraud or misrepresentation. Accordingly, the underlying predicate tort in this case cannot survive summary judgment.

■■■■■■ Initially, plaintiffs cannot establish fraudulent concealment unless they establish that the defendants owed them an affirmative duty to disclose the information at issue. *In re Sofamor Danek Group*, 123 F.3d 394, 400 (6th Cir.1997). Tennessee law recognizes only three circumstances giving rise to a duty to speak: (1) where a definite fiduciary duty existed between the parties; (2) when a party to a contract expressly reposed a trust or confidence in the other party; and (3) where the contract or transaction was intrinsically fiduciary and, therefore, required perfect good faith. *Macon County Livestock Market, Inc. v. Kentucky State Bank, Inc.*,

724 S.W.2d 343 (Tenn.Ct.App.1986) (quoting *Domestic Sewing Machine Company v. Jackson,* 83 Tenn. 418, 424–25 (1885)). Clearly, none of those circumstances are present here.

■ In addition, to establish actionable misrepresentation, plaintiffs must prove that they reasonably relied on a false representation of the defendants. *Metropolitan Government of Nashville & Davidson County v. McKinney,* 852 S.W.2d 233, 237 (Tenn.Ct.App.1992). It is undisputed that prior to the filing of this lawsuit no plaintiff was aware of any representation made by any defendant with respect to beryllium. In fact, for the most part, the plaintiffs were unaware of the names of the beryllium vendors to Y–12 and K–25 because the vendors' labels were removed when the beryllium products reached the plants.

■ Further, even if plaintiffs could state a state law civil conspiracy claim, such a claim would be barred by federal preemption. The United States Supreme Court rejected a similar claim in *Buckman Company v. Plaintiffs' Legal Committee,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), where plaintiffs claimed that the manufacturer of orthopedic screws made misrepresentations to the FDA during the pre-market approval process. Plaintiffs further claimed that absent the misrepresentations, the FDA would not have approved the screws, the screws would not have been marketed, and they would not have been injured. The Supreme Court held that plaintiffs' fraud-on-the-agency claims conflict with the FDA's ability to achieve its statutory objectives and, therefore, are impliedly preempted. *Id.* at 1017. The Court reasoned that the relationship between a federal agency and the entities it governs is inherently federal, and policing fraud against a federal agency is "hardly a field which the States traditionally occupy." *Id.* The Court held that

flexibility is necessary to allow the FDA to balance often competing objectives. *Id.* at 1018. The balance can be disrupted by allowing state-law claims alleging that the agency's decisions were the product of fraud. *Id.* at 1017–18. Consequently, such claims inevitably conflict with the agency's responsibility to police any fraud committed on it consistent with its own judgment and objectives. *Buckman* at 1018.

Similarly, in this case, the DOE must balance policy objectives including economics and national security needs. The DOE determined that the 2.0 standard was appropriate in light of these policy objectives, and plaintiffs' allegations that the exposure standard for beryllium was the result of a conspiracy of fraud conflicts with the DOE's ability to set nuclear policy consistent with its own judgment and objectives. Accordingly, the court concludes that even if the plaintiffs had stated a conspiracy claim, such claim would be preempted by federal law.

## V.

### Conclusion

To summarize, all of plaintiffs' claims against the four remaining are barred by the government contractors defense, the sophisticated users defense, and because defendants had no duty towards any of the plaintiffs. Plaintiffs' civil conspiracy claims fail to state a claim upon which relief can be granted and, even if it did, such claims would be preempted by federal law. In light of the foregoing, all of the remaining four defendants' motions for summary judgment will be granted, and this action will be dismissed. All other pending motions will be denied as moot.

Order accordingly.