Fred L. BYRD and wife, Julia
Byrd, Plaintiffs,

v.

BRUSH WELLMAN, INC., Defendant.

No. CIV-1-87-134.

United States District Court,
E.D. Tennessee, S.D.

Jan. 19, 1990.

Thomas L. Wyatt, Summers & McCrea, Chattanooga, Tenn., for plaintiffs.

James Moffitt and George Carpenter, Leitner, Warner, Moffitt, Williams, Dooley, Carpenter & Napolitan, Chattanooga, Tenn., for defendant.

## MEMORANDUM

EDGAR, District Judge.

This products liability case is presently before the Court upon the second motion of defendant Brush–Wellman Corporation for summary judgment. (Court File No. 84). The defendant's original motion for summary judgment (Court File No. 41) was denied by the Court (Court File No. 73). However, because of a recent development in Tennessee law which has now been raised by Brush–Wellman, the defendant's motion will be GRANTED.

### I. *Background*

Plaintiffs contend the defendant manufactured, sold and delivered its beryllium-containing product in a defective condition unreasonably dangerous to its intended users in that the defendant failed to provide an adequate warning of the risks associated with the use of beryllium-containing products and, further, failed to properly instruct foreseeable users of its products in the proper manner to safely handle beryllium-containing products.

Plaintiff Fred L. Byrd worked in Chattanooga for the Minnesota Mining and Manufacturing Company ("3M") and its successor, the General Electric Corporation ("GE"), from 1965 until 1986. During his employment, Mr. Byrd was exposed to beryllium oxide produced by Brush–Wellman. As a result of this exposure, he has developed berylliosis, a debilitating lung disease, which may result in death.

### II. *Discussion*

A motion for summary judgment shall be granted if, based on the record as a whole, there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party "bears the burden of clearly and convincingly establishing the non-existence of any genuine issue of mate-

rial fact, and the evidence as well as the inferences drawn therefrom must be read in the light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986).

However, "[o]nce the moving party presents sufficient evidence to support the motion under Rule 56(c), ... [t]he nonmoving party is not entitled to a trial merely on the basis of allegations; *significant probative evidence* must be presented to support the complaint." *Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986) (emphasis supplied). Only factual disputes whose resolution "might affect the outcome of the suit" are "material" and preclude the entry of summary judgment. *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987). If, after reviewing the evidence, it appears that no such genuine issue of fact exists, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering the prior motion for summary judgment, this Court found genuine issues of material fact to exist as to the adequacy of Brush–Wellman's warning to 3M and 3M employees and as to the issue of causation. However, it is now necessary to take another look at this case in light of the Tennessee Supreme Court's recent ruling in *Whitehead v. Dycho, Inc.,* 775 S.W.2d 593 (Tenn.1989).

In *Whitehead,* the plaintiff and her husband brought a products liability action for plaintiff's personal injuries resulting from an explosion caused by the chemical naphtha. Defendants were manufacturers and distributors of the naphtha sold to the plaintiff's employer, Magnavox. The plaintiff had access to the naphtha at work. She brought some of the chemical home with her to clean glue off her work apron, but, instead, the chemical caused a violent explosion, resulting in serious injury to the plaintiff.

In affirming the trial court, the court stated: "We are of the opinion that the trial court was correct in granting summary judgment for the Defendants, but for different reasons." *Id.* at 598. The reasons set forth by the trial court were:

1. Defendants owed no duty to warn the Plaintiff with respect to the dangers of naptha because Magnavox was "a skilled, sophisticated, industrial purchaser in bulk from the defendants,"

2. Magnavox was a learned intermediary, who the defendants could reasonably rely upon to warn its employees of the dangers of naptha and to instruct them in its use, and

3. Magnavox's "use of the product was unforeseeable as a matter of law."

*Id.* at 596.

In affirming summary judgment, the Tennessee Supreme Court is unclear as to whether or not it adopts comment n to section 388 of the *Restatement (Second) of Torts* (1985), which states:

**Chattel Known to be Dangerous for Intended Use**

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Comment:

*n.* Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel. The

question remains whether this method gives *a reasonable assurance* that the information will reach those whose safety depends upon their having it. . . . [I]t is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use the chattel by informing the third person of the dangerous character of the chattel, or of the precautions which must be exercised in using it in order to make its use safe.

(Emphasis supplied).

This comment suggests an exception to section 388(c), which imposes liability upon a supplier for the damage proximately caused by the use of his product, in a foreseeable manner, if he fails to exercise reasonable care to give the user information he possesses and which he should realize would be necessary to make the use of the product safe. This exception has been discussed primarily in pharmaceutical drug cases where the company manufacturing and selling the drug discharges its duty to inform the ultimate user, the patient, of the dangerous propensities of the drug by adequately informing the physician, not the patient. *See Mauldin v. Upjohn Co.*, 697 F.2d 644, 647 (5th Cir.), *cert. denied*, 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983); *Dunkin v. Syntex Laboratories, Inc.*, 443 F.Supp. 121, 123 (W.D.Tenn.1977).

Having found that the warning labels and material safety data sheets constituted an adequate warning from the defendants to Magnavox, the court also found that Magnavox was knowledgeable of the dangerous character of naptha. *Id.* at 598. "It was, therefore, reasonable for the Defendants to rely upon Magnavox to convey the information about the hazards of naptha to its employees within the context of comment n of the *Restatement. . . .*" *Id.* As such, "the Defendants had a right to expect the warnings which it had given to Magnavox to be passed along to the ultimate user." *Id.* at 599.

However, in the next part of the opinion, the court discusses the case in terms of causation, finding that "the independent intervening act of Magnavox in placing naptha in small, pump-type containers with no label and failing to warn its employees of the dangerous nature of the product was the proximate cause of the accident." *Id.* These actions were "(1) independent, (2) efficient, (3) conscious, and (4) not reasonably to have been anticipated." *Id.*

The court went even further though, finding that the plaintiff, Magnavox, was "the only party in a position to issue an effective warning to [its employees]." *Id.* at 600. So, even if the defendants had provided inadequate warnings to Magnavox, their actions would not have been the proximate cause of the accident. *Id.* The Fourth Circuit Court of Appeals adopted a similar approach by holding that a product supplier has no duty "to warn employees of knowledgeable industrial purchasers as to product-related hazards." *Goodbar v. Whitehead Bros.*, 591 F.Supp. 552, 566–67 (W.D.Va.1984), *aff'd Beale v. Hardy*, 769 F.2d 213 (4th Cir.1985).

Consequently, the *Whitehead* case sets forth three possible alternatives:

(1) A supplier can discharge its duty to warn the ultimate user of the dangers associated with its product by adequately warning the employer, who can reasonably be expected to pass the information onto its employees.

(2) The employer's own action of not adequately informing its employees of the hazards of the product may be the sole proximate cause of the injury.

(3) The employer may not only be knowledgeable of the product's dangers and safe use, but may also be the only party with reasonable access to its employees, such that the supplier owes no duty to warn those employees.

All of these alternatives hinge upon the information 3M had as to beryllium, whether obtained from Brush–Wellman or other sources. Brush–Wellman's warning to 3M consisted of the following:

1. Warning labels on the outside of the product:

# BERYLLIUM POWDER PRODUCT

## DANGER: DUST OR FUMES HAZARDOUS IF INHALED

This product contains beryllium. Inhalation of concentrations of beryllium in excess of occupational standards described below can cause serious lung disorders. The Occupational Safety and Health Administration (OSHA) has set mandatory limits on occupational exposures. In summary, OSHA requires that:

 Daily time-weighted average exposure over an 8-hour day not exceed 2 micrograms of beryllium per cubic meter of air, and

 Short-term exposures above 5, but no greater than 25, micrograms per cubic meter be permitted for a total of no more than 30 minutes during an 8-hour work period.

- Use only with exhaust ventilation or other controls designed to meet OSHA standards.
- Avoid contact with clothing.
- Keep stored container tightly closed. Flush container clean before discarding.
- Avoid spillage. If any occurs, carefully wet down and remove.
- Not to be taken internally.
- Sold for manufacturing purposes only.

Assistance in establishing safe procedures may be obtained by contacting
Brush Wellman Inc., 17876 St. Clair Avenue, Cleveland, Ohio 44110.

(Court File No. 23, Exhibit A).

1970

# WARNING

## KEEP AWAY from FEED or FOOD PRODUCTS

# POISON

## CAUTION—DO NOT DROP

IF
LEAKING **DON'T** BREATHE FUMES
TOUCH CONTENTS
SWALLOW

THIS IS TO CERTIFY THAT THE CONTENTS OF THIS PACKAGE
ARE PROPERLY DESCRIBED BY NAME AND ARE PACKED
AND MARKED AND ARE IN PROPER CONDITION FOR ·
TRANSPORTATION ACCORDING TO THE REGULA-
TIONS PRESCRIBED BY THE INTERSTATE
COMMERCE COMMISSION.

## BRUSHWELLMAN
. ENGINEERED MATERIALS

Elmore, Ohio 43416

(Court File No. 79, Exhibit F).

1408

1980

(Court File No. 79, Exhibit F).

---

The National Counsel of Safety used Brush–Wellman's label as illustrative of the type label to be used with beryllium-containing products. (Court File No. 23, Exhibits D–3 at 2, D–4 at 2). The packaging of the product itself was pursuant to 3M instructions. This packaging was in double polyethylene bags of ten pounds or less, heat sealed and placed in cardboard drums which were sealed on top by a metal ring and clamp. (Court File No. 23 at 6, Exhibit A). Although a warning label was placed only on the outside of the cardboard drum, Brush–Wellman provided extra copies to attach throughout the production process. (Court File No. 23, Exhibit B at 2).

2. Brush–Wellman also sent a letter to its customers, including 3M, explaining the hazards associated with the use of beryl-

lium-containing products.[1] This letter pointed out the danger of "serious, chronic pulmonary illness" resulting from excessive exposure to airborne particulates from either careless handling or certain operations, including grinding. Further, the letter emphasized the need for all employees handling the beryllium-containing product to "be informed of the hazards involved ... be made aware of the existence of labels and the information on them...." (Court File No. 23 at 10–12, Exhibit B).

3. In responding to 3M's inquiries regarding the product, Brush–Wellman set forth spill and leakage procedures, special protection information and special precautions. This information stressed the need for protection in "operations generating airborne material." (Court File No. 23, Exhibit C at 2).

4. Upon request and free of charge, Brush–Wellman made available articles, surveys, brochures and other literature discussing the dangers and safe use of beryllium-containing products. This literature discusses, in particular, the danger of mists, the type emitted by a centerless grinder. (Court File Nos. 23, Exhibits D–1 and D–2, Exhibit E–2 at 150, No. 56–5, No. 85, Exhibit 7H at 2).

*and ....how to handle them*

---

1. Even though the plaintiffs dispute whether or not 3M actually received such a letter, they have failed to produce significant probative evidence to the contrary. (Court File No. 62 at 26) (*See Celotex Corp.*, 477 U.S. at 317, 106 S.Ct. at 2548).

# BERYLLIUM OXIDE....

This booklet is based on Brush Wellman's more than 30 years of experience with beryllium oxide. It is a general explanation of beryllium oxide's potential toxicity and what to do about it.

Processing and handling beryllium oxide parts can be conducted safely by the use of the simple precautions covered briefly in this booklet.

If there are any questions on the precautions to be used, or if more specific information is needed, industrial hygiene experts employed by Brush Wellman are available to assist and advise customer companies in developing safe handling and processing practices for beryllium oxide.

...won't hurt you if you carry it in your pocket

...is completely safe in its solid state. Handling of finished parts presents absolutely no health hazard.

## Industrial Hygiene and BERYLLIUM OXIDE

No one has ever been poisoned by ingestion of beryllium oxide. Cuts or abrasions from sharp edges of beryllium oxide parts respond to normal first aid treatment. The material will not cause dermatitis. It is not radioactive. It is not combustible or explosive.

Beryllium oxide can be toxic only when dusts, mists or fumes, containing particles small enough to enter the lungs, are inhaled. Even if inhaled, experience indicates that only a relatively small percentage of persons exposed might be affected. Although the proportion of those who might react adversely is small, it is not currently possible to identify the relatively few sensitive persons before exposure.

So limiting inhalation is the obvious safety rule.

Under what conditions may BERYLLIUM OXIDE be a potential health hazard?

... only when processing or related volume operations result in ...

dusts

fumes and mists caused by chemical etching, wet grinding ...

chips

Good industrial housekeeping and properly informed personnel will reduce the potential hazards in processing beryllium oxide.

Operations which generate dust or fumes can be conducted safely when proper precautions are taken. Appropriately designed hoods are used to gather up and remove beryllium oxide dust or fumes from the work area. Then positive filters or other means are used to collect the particles for subsequent disposal.

These precautions ... good housekeeping, informed personnel, avoiding inhalation and proper disposal ... are similar to those used to control processing of toxic materials such as lead and manganese.

What precautions are taken when processing BERYLLIUM OXIDE?

| dusts | fumes | chips |
|---|---|---|
| are removed or captured at the point of origin by local exhausts or liquids | or mists are restrained and drawn off at the point of origin by local ventilation | burrs and slivers are allowed to drop onto machine beds, or equivalent, and vacuumed on regular schedule |

**how to**

**receive**
Beryllium oxide components from Brush Wellman Inc are shipped in properly identified containers Parts are thoroughly cleaned before shipment They are packaged to prevent generation of particles during shipment and subsequent handling while in the shipping container.

**store**
Store with no more precautions than any other material, except to prevent handling by uninformed personnel Beryllium oxide is inert and completely safe in its solid form.

**handle**
Only precaution in handling beryllium oxide components is to guard against the possibility of grinding and crushing action If this should occur, vacuum up the particles and properly dispose of them.

**metallize**
Beryllium oxide is frequently metalized to provide positive ceramic to metal seals. Since BeO reacts with water vapor about 1800°F, forming volatile products, high temperature metallizing operations in most atmospheres should be monitored to determine the concentration levels of airborne beryllium and if necessary, properly ventilated

**braze**
Generally, brazing is not a hygienic problem unless a high temperature moist atmosphere is used This is rarely the case But when it is, exhaust ventilation should be employed

**how to**

**label**
Ultimate responsibility to the end purchaser or user of products containing beryllium oxide should be met by an appropriate warning label

**ship**
Take only the normal protection steps necessary to guard your product for shipment — unless the beryllium oxide components are in exposed positions which might be subject to possible grinding or crushing hazards

**service**
Field service personnel should be cautioned in manuals and instructions against the possibility of field service or repair shop procedures which would generate dust or other small particles from the beryllium oxide parts

**dispose**
Because of its value, Brush Wellman will repurchase clean (unmetalized and uncontaminated) beryllium oxide scrap In cases where economics do not justify the segregation of beryllium oxide scrap for resale burial of solid material is recommended Liquids can be disposed of in the sewer, like other liquid wastes, subject to local ordinances and regulations

**PARTS MADE OF BERYLLIUM OXIDE**

·BERYLLIUM OXIDE CAN ALWAYS BE...

handled with complete safety In its solid, finished state. It is not radioactive, It is not combustible It is not explosive

WITH PROPER PRECAUTIONS...

... beryllium oxide ceramics can be safely ground, lapped, machined, drilled, metallized or subjected to any dust or fume producing operation.

**BRUSHWELLMAN**
ENGINEERED MATERIALS
Elmore, Ohio 43416

5. Lastly, Brush–Wellman had personal contacts with its customers and referrals to appropriate sources when inquiries were made. (Court File No. 23 at 12).

3M's knowledge of the dangers and safe use of beryllium-containing products included:

1. A library available at the Chattanooga plant. 3M established this library, in part, to aid those employees who would be responsible for setting up and maintaining the beryllium ceramics production. Dr. Joseph T. Bailey, Ph.D, who started as a process project engineer on the beryllium project when it shifted from research to production stated:

A We've always been very careful to, you know, maintain a review of the literature. . . . I think we had an extremely good grasp of what had been done up until that time, and don't think there were any papers or literature or developments being written at the time we were working in the area.

Q Did you have any literature available to you for use and review there at the Chattanooga plant?

A Yes, we did. We had pretty extensive literature references. As far as I know, we had almost everything that had

ever been written on beryllium oxide available to us.

(Court File No. 85, Exhibit 2 at 14–15).

Dr. Bailey testified that a "very thorough search" was made for all documents available on the use of beryllium-containing products in the production of ceramics. (Court File No. 85, Exhibit 2 at 19). Members of Industrial Hygiene Services, Donald E. Roach, M.D. and James K. Sugg confirmed the extensiveness of 3M's library, which even contained at least one article published by Brush–Wellman.[2] (Court File Nos. 85, Exhibit 6 at 39–40, Exhibit 7 at 14–15; 23, Exhibit E–5).

2. 3M had a thorough knowledge of the illnesses caused by beryllium exposure as evidenced by the following deposition testimony:

Q If you recall, could you tell us, please, sir, what your knowledge in 1962 or 1963 was with reference to whether or not workers in with beryllium oxide powders could develop a disease known as berylliosis?

A I think that was a well known fact at that particular time, that that's the reason you had the precautions.

(Court File No. 85, Exhibit 2 at 22).

Q Did you have any concept as to whether it was an immediate reaction or there would be a latent reaction?

A As I recall, there were two types. There was acute berylliosis, which came about due to large amounts of exposure over a short period of time that usually was kind of like having pneumonia and you got over it.

The other one was the longer-term berylliosis that you got from longer exposure, smaller amounts over a long period of time that, you know, was irreversible. . . .

(Court File No. 85, Exhibit 2 at 40).

The 3M safety manual states:

1. *Safe Handling and Control of Beryllium Oxide.*

1.1 *General.*

The relative toxicity of beryllium oxide is high in comparison to other oxides. The greatest exposure hazard is inhalation which can cause either an acute or chronic response. . . .

(Court File No. 85, Exhibit 7B at 1). (*See* Ellis Deposition, Court File No. 85, Exhibit 3 at 32; Newton Deposition, Court File No. 85, Exhibit 4 at 14).

3. 3M issued a safety manual to all new employees covering safe handling of the material, correct operating procedures and precautionary safety measures to be followed. (Court File No. 85, Exhibit 7B: Bailey Deposition at 25, 57; Ellis Deposition at 43; Newton Deposition at 14, 19).

4. Routine safety meetings including discussions on the hazards of beryllium oxide, such as the possibility of a serious lung disorder if a person breathed in too much, the need to use safety equipment and answers to any questions that may arise. (Ellis Deposition at 50–52; Newton Deposition at 27; Maples Deposition at 64, 82).

5. Precautionary measures in the production process included:

(1) Special clothing furnished by 3M and laundered through 3M, including shoe covers, caps, underwear and coveralls, along with showers.

(Newton Deposition, Court File No. 85, Exhibit 4 at 15; Maples Deposition, Court File No. 85, Exhibit 5 at 27; Ellis Deposition, Court File No. 85, Exhibit 3 at 26–32).

(2) Individual respirators provided by 3M.

(Newton Deposition, Court File No. 85, Exhibit 4 at 16; Sugg Deposition, Court File No. 85, Exhibit 6 at 32).

(3) Extensive ventilation which included hoods and glove boxes to reduce the possibility of beryllium particulates in the air.

(Bailey Deposition, Court File No. 85, Exhibit 2 at 22, 34, 55; Maples Deposition, Court File No. 85, Exhibit 5 at 39–42).

---

**2.** The article was entitled "Beryllium, Its Industrial Hygiene Aspects." ed. Herbert A. Stokinger.

(4) Systematic air sampling to determine if individual production processes were operating within limits, and, if not, to institute corrective measures.

3M's own sampling discovered excess exposures in the grinding areas, "caused by the aerosol created by the moving parts at the site of grinding. It was conclusive that this mist would have to be controlled; most likely with air movement." (Court File No. 85, Exhibit 7H at 2). (Bailey Deposition, Court File No. 85, Exhibit 2 at 24; Ellis Deposition, Court File No. 85, Exhibit 3 at 49, 54; Maples Deposition, Court File No. 85, Exhibit 5 at 39–42).

All these precautions reflected a company policy that the beryllium oxide operation be run "very carefully and within the recommended limits." (Bailey Deposition at 23).

3M's knowledge of the dangers associated with beryllium oxide is also reflected in its requiring annual physicals for all employees working in that area (Court File No. 85, Exhibit 7B at 10) and the employment of an Industrial Hygiene Services Department, staffed with people with medical and industrial safety backgrounds and who knew the dangers associated with beryllium oxide. (Sugg Deposition; Roach Deposition). Further, the extensive testing and analyses of the operations at the plant reflect an in-depth awareness and understanding of the hazards associated with beryllium oxide. (*See* Court File No. 85, Exhibits 7C–7M).

Given the state of 3M's knowledge regarding beryllium, Brush–Wellman cannot be liable for the injury suffered by the plaintiff, a 3M employee. First, Brush–Wellman clearly provided an adequate warning to 3M regarding the dangers of beryllium, both as to the two forms of berylliosis and the dangers of mist containing beryllium particulates. Second, Brush–Wellman's conduct was clearly not the proximate cause of the plaintiff's injury. Lastly, since 3M was so obviously knowledgeable about the dangers associated with beryllium-containing products and was the only party in a position to effectively warn the plaintiff and guard against those dan-

gers, Brush–Wellman had no duty to warn the plaintiff. As such, under any theory espoused by the Tennessee Supreme Court in *Whitehead v. Dycho*, the defendant is entitled to summary judgment. An appropriate order will enter.