Suzanne **GENEREUX**, et al., Plaintiffs,

v.

**AMERICAN BERYLLIA CORP.,**
**et al., Defendants.**

**Civil Action No. 04–12137–JLT.**

United States District Court,
D. Massachusetts.

Sept. 27, 2007.

Armando J. Acosta, Bourbeau & Floyd, LLP, Alan M. Spiro, Edwards Angell Palmer & Dodge, Boston, MA, William F. Ahern, Jr., MandiJo Hanneke, Clark, Hunt, & Embry, Cambridge, MA, Timothy C. Dietz, Frances C. Lindemann, Michael H. Madigan, Robert M.A. Nadeau, Susan M. Paakkonen, Scott A. Wanner, Kellie A. Cameron, Nadeau & Associates, P.A., Wells, ME, Robert S. Faxon, Jeffrey D. Ubersax, Jones Day, Cleveland, OH, for Defendants.

Peter J. Ainsworth, Leo V. Boyle Meehan, Bradley M. Henry, Meehan, Boyle, Black & Fitzgerald, P.C., Boston, MA, Sherrie J. Cohen, Ruben Honik, Stephan Matanovic, Golomb & Honik, P.C., Philadelphia, PA, for Plaintiffs.

Timothy M. Hudson, Jones Day, Cleveland, OH.

## MEMORANDUM

TAURO, District Judge.

### I. INTRODUCTION

This is a products liability case in which the Plaintiff, Suzanne Genereux ("Genereux"), seeks recovery for having contracted chronic beryllium disease ("CBD"). Genereux, her husband, and their two children originally filed this suit against several defendants, three of which remain: American Beryllia Corp.[1] ("American"), Brush Wellman Inc. ("Brush"), and Hardric Laboratories Inc. ("Hardric") (collectively, "Defendants"). Nine of the thirteen counts alleged in their initial complaint remain for this court to decide: (1) Negligence; (2) Breach of Warranty; (3) Failure to Warn; (4) Breach of Consumer Protection Statute; (5) Fraudulent Concealment; (6) Negligence—Loss of Con-

---

1. For the purposes of this memorandum, this court assumes, without deciding, that successor liability attaches to American Beryllia from its purchase of General Ceramics. The factual record on the issue of successor liability is not sufficiently for resolution. Because summary judgment requires a reading of the facts in the light most favorable to the non-moving party, the past actions of General Ceramics shall be attributed to the party in this case, American Beryllia.

sortium; (7) Breach of Warranty—Loss of Consortium; (8) Failure to Warn—Loss of Consortium; and (9) Breach of Consumer Protection Statute—Loss of Consortium.

Defendants have moved for summary judgment on all counts based on four separate theories: (A) statute of limitations; (B) bulk supplier or sophisticated user doctrine; (C) lack of product identification; and (D) lack of causation. For the following reasons, this court ALLOWS defendants' motions for summary judgment as to all nine claims on the second theory, the sophisticated user doctrine. The first theory, statute of limitations, applies to some, but not all of the claims. Because the claims can be dismissed *in toto* through the sophisticated user doctrine, this court does not reach the third and fourth theories.

## II. FACTUAL BACKGROUND

A court may grant summary judgment only when the moving party has shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2] The court must examine the facts in the light most favorable to the nonmoving party, resolving any reasonable inference in that party's favor.[3] The facts below present the record in the light most favorable to plaintiffs.

From 1982 to 1990, Genereux worked at Raytheon Company's ("Raytheon") Microwave and Power Tube plant in Waltham, Massachusetts. During her tenure, she performed several activities on products that contained beryllium. These activities, which include sandblasting, welding, filing, and brazing, generated airborne beryllium dust that Genereux inhaled.[4] In addition, Genereux also alleges that she was exposed to airborne beryllium dust generated elsewhere in the plant that spread through the ambient air.[5]

During the time of her employment, Defendants supplied Raytheon with a variety of products containing beryllium. Defendant American supplied several beryllium oxide components, including ceramic "windows," pins and collectors.[6] Defendant Brush likewise supplied numerous components containing beryllium, including rectangular plates, discs, rods and tubes.[7] Defendant Hardric supplied beryllium metal emitter rings, using materials originally sourced from Brush.[8]

Raytheon is a large defense manufacturer. In its Waltham plant, Raytheon manufactured electronic equipment for the Department of Defense.[9] Plaintiffs' expert alleges a number of safety deficiencies at the Raytheon plant, including "[f]ailure to train employees in the use, control and hazards associated with the handling of beryllium products;"[10] "[f]ailure to train and provide clothing and respirators for employees working with beryllium materials;"[11] and "[f]ailure to provide for medi-

2. Fed.R.Civ.P. 56(c).

3. *Dasey v. Anderson,* 304 F.3d 148, 153 (1st Cir.2002).

4. Am. Compl. ¶¶ 17, 33.

5. Pls.' Statement of Disputed Facts, ¶ 2.

6. Pls.' Mem. of Law in Opp'n to Def. American Beryllia Corp.'s Mot. for Summ. J., 11–12.

7. Pls.' Mem. of Law in Opp'n to Def. Brush Wellman Inc.'s Mot. for Summ. J., 13.

8. Pls.' Mem. of Law in Opp'n to Def. Hardric Laboratories, Inc.'s Mot. for Summ. J., 5.

9. McCarthy Dep. 29:19–22, 30:3.

10. Martyny Aff. ¶ 53(f).

11. *Id.* at ¶ 53(g).

cal testing, on an annual basis, for employees involved in the production of beryllium components."[12]

In December 2000, Genereux sought to have her disability benefits from Raytheon reinstated. As a Rhode Island resident, she contacted United States Senator Jack Reed. Through her communications with Senator Reed's office, she became aware of the possibility that she may have contracted chronic beryllium disease ("CBD"), a lung disease that develops after long exposure to beryllium dust. In a letter dated January 22, 2001, Senator Reed gave Genereux the phone number for the Department of Labor so that she could request "information concerning compensation for Beryllium exposure."[13] The Department of Labor put Genereux in touch with National Jewish Medical and Research Center ("National Jewish"), a Colorado medical facility with extensive experience with CBD.[14]

On June 8, 2001, Genereux visited her general practitioner, Dr. David Ashley.[15] During that visit, Genereux complained of shortness of breath and wheezing, which Dr. Ashley had previously attributed to her asthma.[16] At this meeting, however, she raised the possibility that she might be suffering from CBD. She handed Dr. Ashley a publication she had received from National Jewish entitled "Facts About Beryllium Disease,"[17] one section of which was entitled "How Do I Find Out If I Have Beryllium Disease?" In relevant part, this section states that screening for beryllium disease begins with a chest x-ray and a blood test.

On June 19, 2001, Genereux again saw Dr. Ashley, and specifically asked to have the relevant blood test. In his notes from the meeting, Dr. Ashley indicated "Beryllium Exposure—in past while employed by Raytheon."[18] Through a series of tests, Genereux was ultimately diagnosed with CBD on September 26, 2002. On June 22, 2004, Genereux filed this cause of action in Middlesex Superior Court. On October 8, 2004, Defendants removed the case to this court.

### III. DISCUSSION

Defendants make four claims for summary judgment, based on the following theories: (A) statute of limitations; (B) the sophisticated user or bulk supplier doctrine; (C) plaintiffs' failure to identify the product; and (D) lack of causation. For the following reasons, this court ALLOWS Defendants' motion for summary judgment as to all counts based on the sophisticated user doctrine.

### A. Statute of Limitations

 Under Massachusetts law, a plaintiff must bring common law claims within three years "after the cause of action accrues."[19] A plaintiff must bring claims based on consumer protection statutes within four years "after the cause of action accrues."[20] As Massachusetts Law does not define when a cause of action accrues, Massachusetts courts "require

---

12. *Id.* at ¶ 53(m).

13. Ubersax Aff. Exh. J at BW–GEN 19213, Letter from Jack Reed, United States Senator, to Suzanne Genereux, Jan. 22, 2001.

14. Genereux Dep. at 213:23–24.

15. *Id.* at 36:8–9.

16. *Id.* at 71:18–24.

17. *Id.* at 37:25–38:4.

18. *Id.* at 42:4–5.

19. Mass. Gen. Laws 260, § 2A.

20. *Id.* § 5A.

that a plaintiff have (1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of harm was."[21] At the same time, Massachusetts also recognizes the discovery rule, which tolls the statute of limitations until plaintiff "is able to recognize some causal connection between the defendant's actions and her injury."[22] As soon as a plaintiff has "knowledge or notice" of her injury and its cause, "the cause of action begins to accrue—even if the plaintiff does not apprehend the full extent or nature of the injury."[23]

■ Plaintiffs filed their complaint on June 22, 2004. In late 2000, Genereux first contacted Senator Reed about beryllium-related disease. On January 22, 2001, Senator Reed's office provided her with the phone number of the Department of Labor so that she could inquire about obtaining compensation for beryllium disease. On June 8, 2001, Genereux discussed the possibility that she had contracted CBD with Dr. Ashley, and handed him a brochure about this disease. During the subsequent visit on June 19, 2001, Dr. Ashley noted that she had been exposed to beryllium while at Raytheon. He also ordered a blood test to determine whether she had contracted CBD.

Connecting the dots, this court finds that, on or before June 19, 2001, Genereux had both an awareness of her injury, and an awareness that her former employment at Raytheon was the cause of this injury. In sum, Genereux was sufficiently apprised to draw the necessary "causal connection" between her presumptive illness and her previous exposure to beryllium. It is true that she was not diagnosed with CBD until September 26, 2002. Nor could she pinpoint which companies supplied beryllium products to Raytheon until a later date. Actual knowledge, however, is not the triggering event for the statute of limitations. By June 19, 2001, she was sufficiently aware of the possibility that she contracted the disease through exposure to beryllium at Raytheon to start the statute of limitations. This court therefore ALLOWS Defendants' motions for summary judgment with respect to plaintiffs' common law claims.

Plaintiffs' statutory claims compel a different result. Plaintiffs have four years after the accrual of the action to bring claims based on breaches of consumer protection statutes. Since this cause of action accrued at the latest on June 19, 2001, and Plaintiffs filed suit on June 22, 2004, their claims fall within the four-year period. This court therefore DENIES Defendants' motions for summary judgment for breach of consumer protection claims due to statute of limitations grounds. These claims must also fail, however, but for other reasons set forth below.

### B. Bulk Supplier/Sophisticated User Doctrines

■ Massachusetts recognizes the bulk supplier doctrine and sophisticated user doctrine in the context of products liability cases.[24] The bulk supplier doctrine allows a supplier of "bulk products, in certain circumstances, to discharge its

21. *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 208, 557 N.E.2d 739 (Mass.1990).

22. *Foisy v. Royal Maccabees Life Ins. Co.*, 356 F.3d 141, 147 (1st Cir.2004).

23. *Zamboni v. Aladan Corp.*, 304 F.Supp.2d 218, 224 (D.Mass.2004).

24. *See Hoffman v. Houghton Chem. Corp.*, 434 Mass. 624, 626, 751 N.E.2d 848 (Mass.2001) (adopting the bulk supplier doctrine); *Carrel v. Nat'l Cord & Braid Corp.*, 447 Mass. 431, 433, 852 N.E.2d 100 (Mass.2006) (adopting the sophisticated user doctrine).

duty to warn end users of a product's hazards by reasonable reliance on an intermediary." [25] The sophisticated user doctrine, by contrast, "protects a supplier from liability for failure to warn when the end user knows or reasonably should know of a product's dangers." [26]

### 1. Bulk Supplier

■ As a preliminary matter, only parties that supply in *bulk* may invoke the bulk supplier doctrine. As interpreted by courts, this normally applies to manufacturers who transport large containers of their product "in tank trucks, box cars or large industrial drums." [27] Indeed, the bulk supplier defense generally applies in cases where a party supplies large amounts of raw material or liquids.[28] Because a bulk product may have "multitudinous commercial uses," it may be impracticable for a manufacturer to warn the employer of all of them.[29] Whether the doctrine also applies to discrete, finished products, such as those supplied by Defendants here, raises at least one question of material fact. This court therefore declines to grant summary judgment based on the bulk supplier doctrine.

### 2. Sophisticated User

■ The sophisticated user doctrine relieves a manufacturer of liability for failing to warn when "the end user knows or reasonably should know of a product's dangers." [30] It embodies the "established principle that a manufacturer may avoid liability 'for failing to warn someone of a risk or hazard which he appreciated to the same extent as a warning would have provided.'" [31] As the Supreme Judicial Court of Massachusetts stated in recently adopting the doctrine, "[i]t is not necessary that the user know the exact characteristics of the product that make it dangerous. It is enough that the user knew or reasonably should have known of the particular danger to be guarded against, in which case an additional warning would have been superfluous." [32] Moreover, "the relevant inquiry turns on the end user's level of sophistication." [33] But before addressing these quantitative issues, this court must first decide *who* the relevant end user is: Raytheon or Genereux?

■ Plaintiffs suggest that Genereux is the end user for the purposes of this analysis, and offer in support a products liability case.[34] There, the court found the relevant end users were consumers who had

---

**25.** *Hoffman,* 434 Mass. at 629, 751 N.E.2d 848.

**26.** *Id.* at 630, 751 N.E.2d 848.

**27.** *Id.* at 633, 751 N.E.2d 848.

**28.** *See, e.g., id. at* 627, 751 N.E.2d 848 (applying bulk supplier doctrine where defendants supplied dangerous chemical in large drums); *Cohen v. Steve's Ice Cream,* 737 F.Supp. 8 (D.Mass.1990) (applying bulk supplier doctrine where defendant transferred a dangerous chemical originally contained in fifty-five gallon drums into smaller containers that leaked and caught fire); *Jones v. Hittle Serv., Inc.,* 219 Kan. 627, 549 P.2d 1383 (1976) (applying bulk supplier doctrine where propane was sold in bulk).

**29.** *Hoffman,* 434 Mass. at 633, 751 N.E.2d 848.

**30.** *Id.* at 630, 751 N.E.2d 848.

**31.** *Carrel,* 447 Mass. at 441, 852 N.E.2d 100, *quoting Slate v. Bethlehem Steel Corp.,* 400 Mass. 378, 382, 510 N.E.2d 249 (Mass.1987).

**32.** *Carrel,* 447 Mass. at 445, 852 N.E.2d 100.

**33.** *Id.* at 441, 852 N.E.2d 100, *quoting Hoffman,* 434 Mass. at 630, 751 N.E.2d 848.

**34.** *Donahue v. Phillips Petroleum Co.,* 866 F.2d 1008 (8th Cir.1989).

purchased a water heater, and not a gas distributor two steps removed from the company that actually sold the gas.[35] Plaintiffs further contend that Raytheon could not be the relevant end user because a "sophisticated user of beryllium oxide ceramics would not sandblast that material without adequate ventilatory controls; nor fail to implement policies mandating the changing of work clothes after working with beryllium." [36]

These arguments fail for at least two reasons. First, unlike the case cited above, Genereux was not a consumer in the distribution chain. Rather, she was an employee at a large corporation that had recognized the danger of beryllium dust since the 1960s. Second, it may have been *injudicious* of Raytheon not to install proper ventilatory controls in the Waltham plant, but that does not mean Raytheon was not a sophisticated user for the purposes of this analysis.

Second, as Defendants maintain, courts have generally considered the employer, not the employee, to be the sophisticated user in similar circumstances. For instance, when employees of a government contractor were injured by beryllium exposure, the contractor, and not the employees, was deemed to be the end user.[37] Similarly, a recent decision handed down by the District of Massachusetts, though factually distinct from this case, also concluded that the employer, not the employee, was the end user for purposes of this analysis.[38]

This court must now determine whether Raytheon knew, or should have known, about the dangers of beryllium, paying due attention to its level of sophistication. For the following reasons, this court holds that Raytheon both knew of the dangers of beryllium, and was sophisticated enough to cope with these dangers.

In determining whether an employer knew or should have known, courts examine the broad range of information available to the employer. For instance, a court held that a supplier of sand had no duty to warn an employer that "had extensive knowledge of the hazards associated with inhaling silica dust, the disease of silicosis, proper dust control methods, and the duty to warn." [39] In another beryllium case, a court examined both the supplier's warning labels, and the employer's own manuals and procedures for handling beryllium, to determine that the employer had "an in-depth awareness and understanding of the hazards associated with beryllium oxide." [40]

Raytheon, too, had substantial knowledge of the dangers of beryllium exposure, manifest in three ways: knowledge held by employees; Raytheon's own policies and internal memoranda; and warnings provided to Raytheon by its suppliers.

First, depositions of Raytheon's own employees reveal that Raytheon knew of the dangers of beryllium. John Chartier, Raytheon's purchasing agent for beryllium at

**35.** *Id.* at 1012.

**36.** Pls.' Mem. of Law in Opp'n to Def. Brush Wellman Inc.'s Mot. for Summ. J., 26.

**37.** *See Morgan v. Brush Wellman, Inc.*, 165 F.Supp.2d 704, 718 (E.D.Tenn.2001).

**38.** *See Taylor v. Airco*, 503 F.Supp.2d 432, 2007 U.S. Dist. LEXIS 64441 at *28 (D.Mass. Aug. 29, 2007) (finding that Monsanto Corpo-

ration, which was both employer and supplier, was the end user for purposes of the sophisticated user doctrine, and not the employee).

**39.** *Beale v. Hardy*, 769 F.2d 213, 215 (4th Cir.1985).

**40.** *See Byrd v. Brush Wellman, Inc.*, 753 F.Supp. 1403, 1413 (E.D.Tenn.1990).

the Waltham plant, testified to Raytheon's awareness in the following way:

Raytheon, when I first started, including today, was extremely sensitive to hazardous type materials, okay? They made it clearly known to the buyer, to me, that it was my responsibility, without exception, to make sure that everything I did was to a procedure and specifications to make sure that no one would inhale dust or anything from the beryllia. It was very, very tightly controlled.[41]

Chartier further noted that vendors of beryllium "had very, very specific instructions on what to do when they sent a package out containing beryllia to Raytheon."[42] Chartier also stated that shipments without the proper beryllium label would be rejected.[43]

Similarly, Al Broadbent, Genereux's manager on the plant floor, suggested that the dangers of beryllium were well known to employees at the Waltham plant, including Genereux:

Q: And did you tell Suzanne Genereux that she should wear the respirator when she was sandblasting?

A: Yeah, she knew.

Q: Did you tell her that the reason she should do that was because of beryllium oxide?

A: Well, she knew it. It was no secret. She knew exactly what was going on. There's no secret. She knew exactly what she was working on. Beryllium. She knew the rules. She knew the regulations. She went to the classes [about beryllium oxide]. . . .

Q: I take it when you were Mrs. Genereux's foreman, you know [sic] that beryllium oxide was dangerous?

A: Right.

Q: You knew it was potentially toxic?

A: Yes.

Q: And how did you learn that?

A: I went to classes with everybody else.[44]

Broadbent also stated that employees on the plant's "beryllium list" went for routine medical tests at a nearby hospital, and was "quite sure" Genereux would have been on the list.[45] The point here is not whether Genereux herself was aware of the perils of beryllium, which she has repeatedly denied. Rather, the depositions amply show that Raytheon employees recognized the threat posed by exposure to beryllium.

Second, Raytheon's internal procedures highlighted the danger of beryllium. In the eight-page "Beryllium Project" memorandum dated November 16, 1960, the following statements reveal a high level of knowledge about beryllium:

1. "In view of the many unknowns in beryllium pathology, the only possible preventative has been to reduce the atmospheric concentrations to within safe limits." It goes on to define these limits as 2 micrograms (equivalent to .002 milligrams) per cubic meter over an eight hour day inside the plant, never to exceed 25 micrograms per cubic meter for any period of time.

2. "Beryllium concentrations are determined by air sampling. A measured volume of air is drawn by means of a

---

41. Chartier Dep. 18:19–19:3.

42. *Id.* at 25:12–14.

43. *Id.* at 25:24.

44. Broadbent Dep. 43:2–43:21.

45. *Id.* at 45:21.

pump through filter paper, the filter paper is then checked for beryllium concentration." [46]

3. In a section entitled "Hazards: 1. Pulmonary," the memorandum specifically notes that berylliosis "is caused by exposure to high concentrations of airborne beryllium or its compounds." This section goes on to state that although 2 micrograms per cubic meter is generally considered safe, forty to fifty people were reported to have developed berylliosis after exposure of only .01 to .1 micrograms per cubic meter.[47]

4. In a section entitled "Tentative Procedures for Processing Beryllia" the memorandum states "[b]ecause of the acute health hazard problem, as well as others, it is our intention that in the handling, processing, and general usage of beryllium and its' [sic] compounds, that we work closely with the various Raytheon safety people, as well as outside consultants, suppliers and others, *in order to comply with all the necessary safety measures*." This section then numerates safety procedures to be deployed in handling beryllium.

5. Finally, components containing beryllia were to be labeled in the following way:

CONTAINS BERYLLIA (BeO)
A TOXIC MATERIAL
DO NOT SANDBLAST, TORCH
BRAZE, HELIARC [sic] WELD,
GRIND, RE—OPERATE [sic] OR
HEAT IN AIR AT MORE THAN 200°
C
*HANDLE WITH RUBBER GLOVES*

A subsequent memorandum, issued at the Microwave and Power Tube Division, likewise reveals Raytheon's intimate knowledge of the dangers of beryllium. Entitled "Beryllium and Its Compounds—Handling of" and dated May 1, 1961, this memorandum also contains myriad statements revealing Raytheon's acute awareness of beryllium:

1. "Not only is beryllium unquestionably a toxic agent, but it is toxic in such small quantities as to be among the most toxic chemically of all elements yet investigated. However, with proper controls, beryllium and its compounds can be used without any ill effects. To this end, all operations giving off dust or fume of beryllium *compounds should be en*closed or supplied with effective local exhaust ventilation."

2. The memorandum states that each Operations Manager shall appoint one individual to coordinate all beryllium activities. This coordinator was charged with (1) opening, inspecting, and cleaning "parts received prior to delivery at the appropriate laboratory;" and (2) establishing "detailed procedures for control of processing and handling of all beryllium or beryllium compounds."

3. The memorandum goes on to elaborate procedures in detail, including:

i. that components containing beryllium first be cleaned ultrasonically in water to eliminate "any trace of toxic dust imbedded in ceramic pores."

ii. that handlers of beryllium wear rubber gloves.

---

46. This shows that Raytheon knew how to monitor beryllium levels.

47. This shows that Raytheon recognized that levels of beryllium below the OSHA standard of 2 micrograms per cubic meter may have been dangerous to certain people.

iii. that the inspection "of beryllium components should be conducted by individuals who are aware of the dangers involved and have been properly instructed in handling procedures, e.g. use of rubber gloves or finger cots."

iv. those responsible for handling beryllium "must emphasize that no attempt should be made to process beryllium parts in any manner that could possibly cause dust or fumes until approval for such a process has been obtained from safety representatives."

4. In a section titled "Medical Control," the memorandum also mandates that employees who work with beryllium have a physical examination, to include urinalysis, a blood test, and a chest x-ray. The chest x-ray "will serve to uncover possible pre-existing lung disease ... and also serve as a base line and reference for future tests." Additionally, all workers must have annual chest x-rays and physical examinations, and be weighed monthly, to monitor this disease.

Furthermore, a seventeen-page memorandum, also issued by Raytheon's Microwave and Power Tube Division, iterates much of the above. Entitled "Instruction Manual for Handling Beryllium & Beryllium Compounds and Alloys," and dated November 20, 1967, the pamphlet specifically notes that "Beryllium and its compound, excluding beryllium copper containing not more than four percent beryllium, MUST NOT BE SANDBLASTED, GROUND, MACHINED, OR TREATED IN ANY WAY THAT MIGHT CAUSE TOXIC DUST, MIST, OR FUMES." The above memoranda evince Raytheon's thorough knowledge of beryllium's toxicity, particularly in its particulate forms.

Plaintiff could conceivably object that it is improper to impute knowledge of Ray-

theon, a large national corporation, to one of its plants in Massachusetts. The first memorandum, however, references the "Beryllium Register of Massachusetts General Hospital." The second and third memoranda originate in the division where Genereux worked, Microwave and Power Tube, and cite their conformity to the "Codes of the Commonwealth of Massachusetts." This suffices to impute Raytheon's knowledge to the Waltham plant.

Third, Defendants apprised Raytheon of the dangers of beryllium, through warning labels they placed on the packages, and Material Safety Data Sheets ("MSDS") they periodically sent to Raytheon. Brush, for instance, had two different warning labels: one on products shipped before November 1985, and another on products shipped after November 1985. The first label, in pertinent part, read: "[t]his product is beryllium. Inhalation of concentrations of beryllium in excess of occupational standards described below can cause serious lung disorders. The Occupational Safety and Health Administration (OSHA) has set mandatory limits on occupational exposures." The label goes on to state the 2 microgram limit per eight-hour day also noted in Raytheon's materials. The second label likewise warns "[t]his product contains beryllium and may contain nickel. Overexposure to beryllium by inhalation may cause berylliosis, a serious chronic lung disease." It further urges employees to "[s]ee Material Safety Data Sheets on file with your employer" for details on the proper OSHA standards and precautions.

In addition to warning labels, Defendants also sent Raytheon MSDSs about the dangers of beryllium. American's MSDS noted, in pertinent part, that "[i]nhalation of Beryllium Oxide Powder may cause berylliosis, a serious chronic lung disease." It also stated that "NIOSH approved high efficiency cartridge or sup-

plied air mask is required if Beryllium in air concentrations exceeds OSHA standards." Whether these labels and MSDAs sufficed as warnings is not the issue. Instead, the point is to determine whether Raytheon knew of the potential danger of beryllium. In light of the above, it is certain that Raytheon knew of the relevant danger.

Raytheon was also a sophisticated company. In 1989, it ranked fifty-third in *Fortune Magazine's* Top 100 List of American Companies. More relevant, however, is Raytheon's keen appreciation of the dangers of beryllium, for which it ordained prophylactic procedures decades before Genereux's employment. Whether Raytheon effectively implemented these procedures, in this analysis, misses the point. None of these Defendants was in a position to tell it otherwise.

For these reasons, this court ALLOWS Defendant's motion for summary judgment as to all claims on the basis of the sophisticated user doctrine. Because there are no remaining claims, this court does not reach the additional theories for summary judgment, based on product identification and causation.

## IV. CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment are hereby ALLOWED as to all nine counts. Though the statute of limitations defense would apply to seven of the nine claims, this court finds that the sophisticated user doctrine relieves defendants of liability for all nine claims.

AN ORDER HAS ISSUED.